IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:12-cv-00006-RLV-DCK

| | |
|---|---|
| DARLENE SUE SACCO, | ) |
| Plaintiff, | ) ) ) |
| v. | ) MEMORANDUM AND ORDER |
| BANK OF AMERICA, N.A., successor by merger to BAC HOME LOAN SERVICING, L.P., | ) ) ) ) ) |
| Defendant. | ) ) ) |

**THIS MATTER** is before the court on Defendant Bank of America's Motion to Dismiss. (Doc. 5.)

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff Darlene Sue Sacco, a resident of Mooresville, North Carolina, here contends that Defendant Bank of America, through its debt-collection efforts, has violated various provisions of the North Carolina Debt Collection Act ("NCDCA"), N.C. Gen. Stat. § 75-50 *et seq.*, as well as the Telephone Consumer Protection Act ("TCPA"), 42 U.S.C. § 227. Defendant, headquartered in Charlotte, North Carolina, and with a principal executive office in Charlotte, North Carolina, and a registered agent in Raleigh, North Carolina, here moves to dismiss Plaintiff's Complaint, arguing that the NCDCA-based claims are preempted by federal law and therefore do not survive Federal Rule of Civil Procedure 12(b)(6), and that the TCPA-based claim is insufficiently supported by the alleged facts vis-à-vis Federal Rule of Civil Procedure 8(a).

Plaintiff, a "consumer" within the meaning of N.C. Gen. Stat. § 75-50(1) as a natural

1

person who has "incurred a debt or alleged debt for personal, family, household or agricultural purposes," alleges that Defendant, a "debt collector" as defined by N.C. Gen. Stat. § 75-50(3), has contacted or attempted to contact her in an unlawful manner in order to collect a mortgage debt that Defendant was not obligated to pay. (Doc. 1-1 at 6.) In April 2011, Plaintiff filed for bankruptcy protection and included Bank of America as a creditor to be discharged. (Doc. 1-1 at 6.) Bank of America's debt was not discharged until July 2011, yet on or about April 5, 2011, the U.S. Bankruptcy Court for the Western District of North Carolina sent a notice to Bank of America, advising it that Plaintiff had filed for bankruptcy and that "any further attempts to collect a debt from the Plaintiff were strictly prohibited." (Doc. 1-1 at 6.)

Defendant thereafter continued to call Plaintiff's cellular phone in an attempt to collect the alleged debt. (Doc. 1-1 at 6.) On July 11 and 12, 2011, Plaintiff's counsel sent letters to Defendant, warning that its attempts to collect Mrs. Sacco's debt were "in violation of the law and that Mrs. Sacco would act to enforce her rights . . . ." (Doc. 1-1 at 6.) Despite Plaintiff's correspondence, Defendant continued in its efforts to collect the debt, even after it had knowledge or reason to know that Plaintiff had filed bankruptcy, that the debt was discharged, and that Plaintiff was represented by counsel. (Doc. 1-1 at 6.)

Plaintiff alleges that Defendant called her cellular phone at least 197 times between April 4, 2011, and November 29, 2011, and more than fifty times between November 29, 2011, and January 23, 2012. (Doc. 1-1 at 7.) In placing these calls, Defendant allegedly used an automatic telephone dialing system or a prerecorded or artificial voice. (Doc. 1-1 at 7.) Plaintiff further alleges that, in making the calls, Defendant failed to alert her that it was a debt collector, in violation of N.C. Gen. Stat. § 75-54(2). (Doc. 1-1 at 7.) Plaintiff has characterized such behavior as conduct, the natural consequence of which is to harass, to oppress, or to abuse Plaintiff by

causing her phone to ring excessively. (Doc. 1-1 at 7.)

Plaintiff asserts that she did not expressly consent to the phone calls and that she, on multiple occasions, told Defendant that she had filed bankruptcy and no longer owed a debt. (Doc. 1-1 at 7.) She conveyed the name of her attorney and her bankruptcy case number, and told Defendant to stop calling her. (Doc. 1-1 at 7.) Due to Defendant's continued calls to Plaintiff's cellular phone after this communication, Plaintiff contends that Defendant willfully or knowingly violated the TCPA, which prohibits the use of any automatic telephone dialing system or an artificial or prerecorded voice for non-emergency reasons.

As a result of these phone calls, Plaintiff claims that she suffered injury in the form of emotional distress, humiliation, embarrassment, and mental anguish. (Doc. 1-1 at 8.) As such, Plaintiff requests fair and reasonable compensatory damages for the emotional distress, aggravation, annoyance, and inconvenience that she suffered as a result of Defendant's allegedly unlawful acts. (Doc. 1-1 at 8.) Plaintiff further requests actual, statutory, and punitive damages, attorney's fees, and other expenses. (Doc. 1-1 at 8.) Plaintiff finally seeks declarative and injunctive relief, such that would prevent Defendant from placing any non-emergency calls to Plaintiff's cellular phone. (Doc. 1-1 at 9.)

## II. STANDARD OF REVIEW

Defendant here moves to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(6) and 8(a) of the Federal Rules of Civil Procedure. Rule 12(b)(6) provides for the dismissal of a claim based upon a plaintiff's "failure to state a claim upon which relief can be granted." Pursuant to Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." In evaluating motions to dismiss, the court must construe the complaint's factual allegations "in the light most favorable to the plaintiff" and "must accept as

true all well-pleaded allegations." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). The court, however, will neither "accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d. 175, 180 (4th Cir. 2000)).

While Rule 8(a)(2) does not require "detailed factual allegations," a complaint must offer more than "naked assertion[s]" and unadorned "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order to survive a Rule 12(b)(6) motion to dismiss, the facts alleged must be sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Requiring plausibility "does not impose a probability requirement at the pleading stage." *Id.* at 556. It does, however, demand more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 662. Ultimately, a claim has facial plausibility when the plaintiff pleads factual content that permits the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663.

### III. ANALYSIS

A.  State Claims

Plaintiff raises one federal claim and multiple state claims. As regards the state claims, Plaintiff alleges Defendant's violation of various provisions of the NCDCA, namely, N.C. Gen. Stat. § 75-54(2), (4), which state that

> [n]o debt collector shall collect or attempt to collect a debt or obtain information concerning a consumer by any fraudulent, deceptive or misleading representation. Such representations include, but are not limited to the following:
> . . .
> (2) Failing to disclose in all communications attempting to collect a debt that the purpose of such communication is to collect a debt;

4

> . . .
> (4) Falsely representing the character, extent, or amount of debt against a consumer or of its status in any legal proceeding; falsely representing that the collector is in any way connected with any agency of the federal, State or local government; or falsely representing the creditor's rights or intentions;

N.C. Gen. Stat. § 75-52(3), which states that

> [n]o debt collector shall use any conduct, the natural consequence of which is to oppress, harass, or abuse any person in connection with the attempt to collect any debt. Such unfair acts include, but are not limited to . . . [c]ausing a telephone to ring or engaging any person in telephone conversation with such frequency as to be unreasonable or to constitute a harassment to the person under the circumstances or at times known to be times other than normal waking hours of the person;

N.C. Gen. Stat. §§ 75-55(2)–(4), which state that

> [n]o debt collector shall collect or attempt to collect any debt by use of any unconscionable means. Such means include, but are not limited to, the following:
> . . .
> (2) Collecting or attempting to collect from the consumer all or any part of the debt collector's fee or charge for services rendered, collecting or attempting to collect any interest or other charge, fee or expense incidental to the principal debt unless legally entitled to such fee or charge.
> (3) Communicating with a consumer (other than a statement of account used in the normal course of business) whenever the debt collector has been notified by the consumer's attorney that he represents said consumer.
> (4) Bringing suit against the debtor in a county other than that in which the debt was incurred or in which the debtor resides if the distances and amounts involved would make it impractical for the debtor to defend the claim;

and N.C. Gen. Stat. § 75-1.1, which states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

Defendant contends that federal law preempts these state statutory provisions. The doctrine of preemption derives from the Supremacy Clause of the U.S. Constitution, which deems federal law the "supreme law of the land" and renders state laws that conflict with valid federal law "without effect." U.S. Const. art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.*, 505 U.S.

504, 516 (1992). To determine whether preemption is applicable to a particular statute, courts look to congressional intent, *Fid. Fed. Sav. & Loan Assoc. v. de la Cuesta,* 458 U.S. 141, 152 (1982), and generally apply the maxim that

> [a preemption] [a]nalysis begins with the presumption that Congress did not intend to displace state law. Where . . . the field which Congress is said to have preempted has been traditionally occupied by the States, . . . the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress,

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 116 (1992) (Souter, J., dissenting) (internal quotations and citations omitted).

As a general rule, the Supreme Court has recognized three congressional modes of preemption: express, implied, and conflict preemption. *English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79 (1990). Express preemption occurs where explicit statutory language makes clear Congress's intent to preempt state authority, and implied preemption occurs when Congress's command is implicit through a statute's structure and purpose. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 (1977). Conflict preemption occurs either as a result of a direct conflict between state and federal law, such that compliance with both is impossible, or because a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 596 (4th Cir. 2005).

Consumer protection laws, such as the NCDCA, "have historically fallen into the purview of the states' broad police powers, to which the courts have afforded special solemnity." *In re Pryor*, 479 B.R. 694, 698 (Bankr. E.D.N.C. 2012) (quoting *Sukumar v. Nautilus, Inc.,* 829 F. Supp. 2d 386, 392 (W.D. Va. 2011)) (remaining citations omitted). As such, the preemption analysis in this case should begin "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest

6

purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). However, "an 'assumption' of [non-pre]emption is not triggered when [a] State regulates in an area where there has been a history of significant federal presence[, and t]he regulation of federally chartered banks is indisputably such an area." *Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330 (4th Cir. 2006). Therefore, if the form of Defendant's debt-collection efforts here at issue sufficiently involves an enumerated or incidental power of national banks, this presumption against preemption will not apply.

These juxtaposed principles regarding a preemption presumption are, for the purposes of this case, effectively addressed and consolidated within the standard articulated in the Supreme Court's decision in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). In *Barnett Bank*, the Court concluded that a federal statute permitting national banks to sell insurance in small towns preempted a state statute forbidding the practice. In reaching this conclusion, the Court stressed that the two statutes were in "irreconcilable conflict." *Id.* at 31. Although the statutes did not impose directly conflicting duties on national banks, the state statute authorized banks to engage in practices that the federal statute expressly forbade, and thus stood as "an obstacle to the accomplishment" of one of the federal law's purposes. *Id.* The decision

> directs courts to determine national bank preemption by analyzing whether a state statute is irreconcilably in conflict with the NBA. Thus, courts must now determine whether the state measure "either (1) imposes an obligation on a national bank that is in direct conflict with federal law, or (2) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Meluzio v. Capital One Bank (USA), N.A.*, 469 B.R. 250, 255 (N.D.W. Va. 2012) (quoting *Cline v. Bank of Am., N.A.*, 823 F. Supp. 2d 387, 397–98 (S.D.W. Va. 2011)). Such a conflict or obstacle arises where a state "forbid[s], or impair[s] significantly, the exercise of a power that

Congress explicitly granted." *Barnett Bank*, 517 U.S. at 33. But "[t]o say this is not to deprive States of the power to regulate national banks, where . . . doing so does not prevent or significantly interfere with the national bank's exercise of its powers." *Id.* (citations omitted).

In its Motion to Dismiss, Defendant contends that Plaintiff's NCDCA claims are preempted by the National Bank Act of 1864 ("NBA"), 12 U.S.C. § 21 *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency ("OCC"). (Doc. 5-1 at 5–6).[1] The "object" of the NBA was to "establish a national banking system" free of state regulation that is unduly intrusive to a national bank's exercise of a function essential or incidental to banking. *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 561 (9th Cir. 2002) (quoting Cong. Globe, 38th. Cong., 1st Sess., 1451 (1864)); *see also Watters v. Wachovia Bank*, 550 U.S. 1, 11–12 (2007) (reiterating that "when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way"). Pursuant to the NBA, the OCC is vested with the authority to regulate national banking institutions. *In re Pryor*, 479 B.R. at 698; *see also* 12 U.S.C. § 371 (vesting in the OCC the federal regulation of real-estate loans made by national banks). While OCC regulations contain a clause that exempts from preemption state laws that regulate the right to collect debts, 12 C.F.R. § 34.4(b),[2] Defendant maintains that this protection does not affect laws that regulate the means that a bank may employ to collect its debt (Doc. 5-1 at 7) (citing OCC Interpretive Letter No. 1082, 2007 WL 3341502 (2007) (interpreting the similar "right to collect debts" savings clause

---

[1] States have maintained a parallel regulatory authority over state banks. This system of dual regulation, referred to by the Supreme Court as "equalization," preserves the federalist balance between the states and the federal government with respect to banks operating within their respective spheres. *See Lewis v. Fidelity & Deposit Co. of Md.*, 292 U.S. 559, 564 (1934) (recognizing that "[t]he policy of equalization was adopted in the National Bank Act of 1964"); G. Marcus Cole, *Protecting Consumers from Consumer Protection: Watters v. Wachovia Bank*, Cato Sup. Ct. Rev., 2006–2007, at 251, 252.

[2] Defendant additionally cites 12 C.F.R. § 7.4008(e)(4), which applies to non-real-estate loans.

8
Case 5:12-cv-00006-RLV-DCK   Document 11   Filed 12/17/12   Page 8 of 18

in 12 C.F.R. § 7.4007(c), which regards deposit-taking activities, to pertain only to the *right* to recover a debt, as distinct from the means by which a bank pursues such a right)).

1. The Application of Dodd–Frank

Because Defendant asserts that the NBA preempts Plaintiff's state-law claims, it is appropriate to consider the fairly recently enacted Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified at 12 U.S.C. § 5301 *et seq*.), which contains express preemption provisions relating to the operations of national banks. The Dodd–Frank Act was signed into law on July 21, 2010, by President Barack Obama. While the Act itself states that it shall become effective on its transfer date, July 21, 2011, some courts have held that Dodd–Frank's mandates apply to actions that occurred prior to July 21, 2011. *See Meluzio*, 469 B.R. at 255; *Cline*, 823 F. Supp. 2d at 396; *see also* 12 U.S.C. § 5551; *cf* 12 U.S.C. § 5553 ("This subchapter . . . shall not be construed to alter or affect the applicability of any regulation . . . issued . . . by the [OCC] . . . regarding the applicability of State law under Federal banking law to any contract entered into on or before July 21, 2010, by national banks . . . .");[3] *Davis v. World Sav. Bank*, 806 F. Supp. 2d 159, 166 n.5 (D.D.C. 2011) (refusing to apply retroactively to the Home Owners Loan Act ("HOLA"), 12 U.S.C. § 1461 *et seq.*, the Dodd–Frank preemption standard, which provides "that HOLA does not occupy the field in any area of state law and that preemption is [instead] governed by the [conflict preemption] standards applicable to national banks" per *Barnett Bank*). The matter of retroactivity is pertinent to the case at hand because Plaintiff entered into the subject loan contract on April 21, 2006, prior to the statute's transfer date. The Court must therefore determine whether it is here appropriate to

---

[3] "Even assuming that section 5553 might be construed to extend to [12 U.S.C. § 25b, discussed *infra.*] . . . it is immaterial for present purposes. [This language] in section 5553 was intended to preserve existing contracts by national banks, not to effectively insulate those institutions from generally applicable state consumer protection actions aimed at postcontractual collection activities." *Cline*, 823 F. Supp. 2d at 396.

apply Dodd–Frank's preemption standard.

A new statute does not produce a retroactive effect "merely because it is applied in a case arising from conduct antedating the statute's enactment." *Chambers v. Reno*, 307 F.3d 284, 289 (4th Cir. 2002) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994)). Instead, the relevant inquiry is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id*. A statute would attach "new legal consequences" to prior events if its application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*

Dodd–Frank's preemption provisions state that state consumer financial laws are preempted only if

> **(A)** application of a State consumer financial law would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State;
> **(B)** in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996), the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers; . . . or
> **(C)** the State consumer financial law is preempted by a provision of Federal law other than title 62 of the Revised Statutes.

12 U.S.C. § 25b(b)(1). A "state consumer financial law" is earlier defined as

> a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer.

*Id.* § 25b(a)(2).

In large part, Dodd–Frank codified *Barnett Bank*, thereby affirming that a preemption analysis should be guided by consideration of whether the statutes in issue are in "irreconcilable

conflict" such that compliance with both statutes is impossible or that observance of the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Barnett Bank*, 517 U.S. at 31; *Meluzio*, 469 B.R. at 255.

Because Dodd–Frank's preemption provisions are essentially a codification of the *Barnett Bank* decision, the U.S. District Court for the Northern District of West Virginia has noted that they "are better understood as clarifications of the law as opposed to substantive changes thereof, . . . and their application here does not work an impermissible retroactive effect." *Meluzio*, 469 B.R. at 255.[4] Indeed, Defendant's right to collect the debt owed is not altered by the enactment of Dodd–Frank and is still subject to underlying contractual agreements and Plaintiff's bankruptcy proceeding, just as it would have been had the Dodd–Frank Act preemption provisions not applied. *In re Pryor*, 479 B.R. at 701. The Dodd–Frank Act does not appear to have impaired Defendant's rights, increased its liability, or imposed new duties upon it in this context. Dodd–Frank, with respect to the preemption standard to be applied to state laws regulating the debt-collection activities of national banks, makes no substantial change and therefore imposes no pertinent, significant retroactive effect.

2. OCC Regulations

Defendant further argues that Plaintiff's claims are preempted under the OCC's regulatory counterpart to the NBA, 12 C.F.R. § 34.4(a), which states that "[a] national bank may make real estate loans . . . without regard to state law limitations concerning: . . . (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages."

---

[4] Moreover, the language of Dodd–Frank provides some evidence of Congress's intent regarding the retroactivity of the preemption framework established by the legislation. Section 1044 is itself entitled "State law preemption standards for national banks and subsidiaries *clarified*." Dodd–Frank Act § 1044, 124 Stat. at 2014 (emphasis added). Use of the word "clarified" indicates that Congress intended simply to clarify the existing preemption guidelines contained in the regulations rather than create new substantive law. As such, Dodd–Frank was not intended to impose new duties. *See In re Pryor*, 479 B.R. at 700.

11
Case 5:12-cv-00006-RLV-DCK   Document 11   Filed 12/17/12   Page 11 of 18

However, the regulation continues:

> State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 [116 S.Ct. 1103, 134 L.Ed.2d 237] (1996):
> (1) Contracts;
> (2) Torts;
> . . .
> *(5) Rights to collect debts;*
> (6) Acquisition and transfer of real property;
> . . . and
> (9) Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996), or that is made applicable by Federal law.

12 C.F.R. § 34.4(b) (emphasis added). In light of the OCC's Interpretive Letter No. 1082, the Court must determine whether the NCDCA falls within 12 C.F.R. § 34.4(b)(5).

The interpretive letter addresses whether certain overdraft practices of a bank constitute an exercise of a "right to collect debts" for purposes of the OCC's regulations concerning the applicability of state law to a national bank's deposit-taking activities. Therein, the First Senior Deputy Comptroller and Chief Counsel,[5] after first determining that the authority of national banks to charge non-interest fees and charges is incidental to their express power to engage in deposit-taking, concluded that overdraft practices do not implicate the "[r]ights to collect debts" provision of 12 C.F.R. § 7.4007(c). Citing regulatory history, the OCC's Deputy Comptroller and Chief Counsel further concluded that "state statutes and decisional law regulating debt

---

[5] In addition to imposing a number of other procedural requirements, the Dodd–Frank Act now forces the Comptroller of the Currency to make any preemption determination personally; no longer may such determinations be delegated to a subordinate, such as the chief counsel, who had in times past written a series of such letters stating that various state laws were preempted. 12 U.S.C. § 25b(b)(6) ("Any regulation, order, or determination made by the Comptroller of the Currency under paragraph (1)(B) shall be made by the Comptroller, and shall not be delegable to another officer or employee of the Comptroller of the Currency.")

collection activity are not what the rule captured."[6] OCC Interpretive Letter No. 1082, 2007 WL 3341502, at *4 n.12; *see also In re Jones*, 449 B.R. 494, 501 (Bankr. N.D.W. Va. 2011) ("An important distinction exists, however, between a state law governing a right to collect a debt and a state law on debt collection that governs how a national bank may act to collect that debt."), *rev'd sub nom. Meluzio v. Capital One Bank (USA), N.A.*, 469 B.R. 250 (N.D.W. Va. 2012).

As a threshold matter, no suggestion has been made regarding the extent to which such a letter should be accorded deference. The letter was not issued through notice-and-comment rulemaking, and generally, such letters are analyzed under *Skidmore*. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that "while not controlling upon the courts by reason of [its] authority," such an interpretation is to be given weight "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"); *see also Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (holding that where Congress has not authorized a federal agency to preempt state law directly, the weight accorded the agency's explanation of a state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness). The Court here sees no reason to accord a higher measure of deference. *Cf. United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001) (deeming there to be occasion for according *Chevron* deference even in the absence of notice-and-comment rulemaking or formal adjudication given circumstances adequately suggesting that Congress would consider such deference deserved).

Although the OCC's position on preemption with respect to certain state laws addressing

---

[6] The letter's author appears to have further concluded that such a service fee owed is simply not a "debt," which would render superfluous her conclusion regarding the rule's contemplation of debt-collection activity. OCC Interpretive Letter No. 1082, 2007 WL 3341502, at *4 (concluding that "the Bank is not creating a 'debt' that it then 'collects' by recovering the overdraft and the overdraft fee from the account").

overdraft fees is sensible, to deem as preempted under 12 C.F.R. § 34.4 any state regulation of a means utilized by the bank to pursue its right to recover a debt—at least absent an additional determination by the OCC or Congress pursuant to section 34.4(b)(9)—would essentially be to substitute the *Barnett Bank* directive with a more wide-ranging preemption standard. There is before the Court no sufficient indication that Congress intended the OCC's position as articulated in the interpretive letter to supersede all state law on the matter. The Court thus accords little weight to the letter's broad statement that "state statutes and decisional law regulating debt collection activity are not what the rule captured,"[7] and moves on to apply the standard articulated in *Barrett Bank*.

3. Ordinary Preemption Principles

Because the *Barnett Bank* analysis is subsumed within Dodd–Frank, even assuming that Dodd–Frank's provisions do not apply to the instant case, as Defendant here alleges, the preemption analysis essentially remains the same. As previously noted, in determining whether a statute is preempted by federal law, it is necessary to look first at Congress's intent in drafting the federal law. The congressional intent in enacting the NBA was to "establish a national banking system" that was free from intrusive state regulation.

Despite this objective, as a result of the nation's dual banking system and because federal law is generally interstitial, the Supreme Court has recognized that "national banks must comply with most of the same rules as their state counterparts." *Watters*, 550 U.S. at 23–24. To this end, the Court has held that "[f]ederally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the

---

[7] Presuming Dodd–Frank to apply to this case, such a blanket regulatory stance would appear to violate section 1044(a) of the Act, which mandates that preemption determinations "be made by a court, or by regulation or order of the Comptroller of the Currency *on a case-by-case basis*, in accordance with applicable law . . . ." 12 U.S.C. § 25b(b)(1)(B) (emphasis added); *see also* 12 U.S.C. § 25b(b)(3)(A) (defining "case-by-case basis").

general purposes of the NBA." *Id.* at 2. The Court further noted that

> States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's . . . exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way.

*Id.* at 12.

In what remains a lodestar of the Court's jurisprudence regarding the preemption of state laws affecting national banks, the Court in *Nat'l Bank v. Commonwealth*, 76 U.S. 353, 362 (1869), described a national bank's right to collect debts as based in state law and noted that "[i]t is only when the State law incapacitates the banks from discharging their duties to the government that [the state law] becomes unconstitutional." This sentiment was renewed in *Barnett Bank*, in which the Court held that nondiscriminatory laws of general application that do not "forbid," "impair significantly," "prevent," or "significantly interfere" with a national bank's exercise of its powers should not be pre-empted. 517 U.S. at 33.

In the instant case, the NCDCA does not prohibit or significantly impair Defendant from collecting its debts; it merely restricts debt collectors from engaging in "abusive" collection practices. The statute's prohibitions against such practices are not in direct conflict with federal law as there is no such law that permits them. Additionally, the statute does not stand as an obstacle to the purposes and objectives of Congress in enacting the NBA and safeguarding Defendant's ability to make and to collect upon pertinent loans. Defendant may still make loans and collect debts, but like every debt collector in North Carolina, it must abide by the mandates of NCDCA and refrain from engaging in certain collection practices. Therefore, the NCDCA is not preempted by the NBA or any OCC regulation.

B. Federal Claim

Plaintiff raises a claim under the Telephone Consumer Protection Act, which states,

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a . . . cellular telephone service.

47 U.S.C. § 227(b)(1)(A)(iii).

Defendant claims that Plaintiff failed to state a claim for relief due in large part to a declaratory ruling adopted by the Federal Communications Commission that interpreted the "prior express consent provision" of the TCPA. In relevant part, the declaratory ruling states,

> Because we find that autodialed and prerecorded message calls to wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party, we clarify that such calls are permissible. We conclude that the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt.

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559, 563 (2008). The ruling goes on to state that "the [FCC] determined that 'persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.'" *Id*.

Regardless of whether this FCC interpretation of the TCPA is entitled to *Chevron* deference, *see Mead,* 533 U.S. at 226–27 (holding that an administrative interpretation "qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference

was promulgated in the exercise of that authority"); *see generally Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (holding that, because the FCC is authorized to promulgate binding legal rules and it "issued the order under review in the exercise of that authority," its interpretation of the Communications Act was entitled to *Chevron* deference), this Court lacks jurisdiction to review its validity, 28 U.S.C. § 2342 (giving the federal courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47"). Because the courts of appeals have been vested with exclusive jurisdiction to review the validity of FCC rulings, this Court will here accept as valid this FCC ruling, which is a "final order" for the purposes of 28 U.S.C. § 2342 because it was the agency's final decision interpreting the "prior express consent" provision of the TCPA and determines legal rights and obligations.[8] *See Am. Trucking Ass'n, Inc. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985) (deeming a "final agency action" under the APA to be analytically equivalent to a "final order" under the Hobbs Act). However, because the pertinent allegations do not inform the Court as to how Defendant obtained Plaintiff's cellular phone number and because Plaintiff states in her Complaint that she told Defendant to stop calling her, the Court cannot, at this time, dismiss Plaintiff's TCPA claim. (*See* Doc. 1-1 at 7.)

---

[8] The matter of interpreting the FCC's ruling and determining whether Defendant's actions here abide by that ruling remains within the province of this Court.

17
Case 5:12-cv-00006-RLV-DCK   Document 11   Filed 12/17/12   Page 17 of 18

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Dismiss (Doc. 5) be **DENIED**.

Signed: December 13, 2012

Richard L. Voorhees
United States District Judge